# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| TERRENCE JOHNSON, JIM HARRIS, | ) | |
| ALEXANDER FRIEDMANN, | ) | |
| and JOSHUA ROBERTS | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 03-08-0187 |
| | ) | |
| vs. | ) | Hon. Thomas A. Wiseman, Jr. |
| | ) | U.S. District Court Judge |
| PHIL BREDESEN, Governor of the State | ) | |
| Tennessee, BROOK THOMPSON, | ) | Hon. Juliet Griffin |
| Coordinator of Elections, | ) | U.S. Magistrate Judge |
| RILEY DARNELL, Secretary of State of | ) | |
| Tennessee, JAMES JOHNSON, | ) | |
| Administrator of Elections for Shelby | ) | |
| County, KIM BUCKLEY, Administrator of | ) | |
| Elections for Madison County, and | ) | |
| RAY BARRETT, Administrator of Elections | ) | |
| for Davidson County, in their official | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
## FOR JUDGMENT ON THE PLEADINGS OR IN THE
## ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.  STATEMENT OF FACTUAL AND LEGAL ISSUES

Plaintiffs have moved the Court for judgment on the pleadings pursuant to Fed. R.

Civ. P. 12(c), or in the alternative for partial summary judgment pursuant to Fed. R. Civ.

P. 56(a).  They contend that Tenn. Code Ann. §§ 40-29-202(b) and (c) (the "Statutes"),

which condition restoration of voting rights for people convicted of infamous crimes, or

felonies, on the payment of legal financial obligations (LFOs), i.e., restitution and child

support payments, are facially unconstitutional in violation of the Equal Protection

Clause of the Fourteenth Amendment, the Twenty-Fourth Amendment, the Ex Post Facto Clauses of the United States and Tennessee Constitutions, and the Privileges and Immunities Clause of the United States and Tennessee Constitutions.[1]  Plaintiffs Johnson and Roberts have been convicted of felonies, and have served their sentences but are still ineligible to vote because they have not paid their LFOs.

Plaintiffs further contend that the pleadings and the plaintiffs' declarations show that there is no genuine issue as to any material fact concerning plaintiffs' claim that the Statutes are facially unconstitutional and that plaintiffs are entitled to partial summary judgment as a matter of law.

## II.    PROCEDURAL HISTORY

Plaintiffs filed the instant lawsuit on February 25, 2008, seeking to invalidate Tenn. Code Ann. §§ 40-29-202(b) and 40-29-202(c), which condition restoration of voting rights for people convicted of infamous crimes on the payment of legal financial obligations (LFOs), namely restitution and child support.  Compl. at ¶ 1.  Defendants Kim Buckley, James Johnson, and Ray Barrett filed a motion to be dismissed from the case, which this Court denied.  Order Denying Mot. Dismiss, June 23, 2008.  This Court held a case management conference on April 7, 2008 and set the deadlines for discovery and the filing of dispositive motions.  Case Management Order, April 11, 2008.  This Court held another scheduling conference on July 25, 2008, at which time defense counsel for Defendants Bredesen, Thompson, and Darnell indicated that they would file a motion seeking a resolution of Plaintiffs' constitutional claims as a matter of law, and

_____

[1]Tenn. Code Ann. § 40-20-112 defines all felonies as being infamous crimes.  For purposes of this memorandum, Plaintiffs use the terms "infamous crime" and "felony" interchangeably.

Case 3:08-cv-00187   Document 69   Filed 08/22/08   Page 2 of 24 PageID #: 318

this Court established an expedited motion schedule.  Case Management Order, July 28, 2008.  Plaintiffs moved to amend their complaint on July 17, 2008, to add Joshua Roberts as a Plaintiff and this Court granted that motion.  Order Granting Mot. Amend Compl., July 28, 2008.  On August 1, 2008, Defendants Bredesen, Thompson, and Darnell filed a Fed. R. Civ. P. 12(c) motion for a judgment on the pleadings, which Plaintiffs have opposed.

### III.    APPLICABLE LEGAL STANDARDS

#### A.    Fed. R. Civ. P. 12(c).

Courts review a Fed. R. Civ. P. 12(c) motion for judgment on the pleadings under the same standard used for analyzing a Fed. R. Civ. P. 12(b)(6) motion to dismiss. Sensations, Inc. v. City of Grand Rapids, 526 F.3d 291, 295 (6th Cir. 2008).  When ruling on a Fed. R. Civ. P. 12(c) motion, the court must assume that the complaint's factual allegations are true and should construe all inferences from them in the non-moving party's favor.  U.S. v. Ford Motor Co., 532 F.3d 496, 502 (6th Cir. 2008); Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001).  In general, a court may not consider materials outside the pleadings when resolving a Fed. R. 12(c) motion. Hildebrand v. Board of Trustees, 607 F.2d 705, 709-10 (6th Cir. 1979).  A court also must not look at whether the plaintiff will "ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

In Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1969-70 (2007), the Court held that the "no set of facts" language in Conley v. Gibson, 355 U.S. 41 (1957), "has earned its retirement," and that a court should look instead for "plausibility" in a

plaintiff's claim in ruling on a defendant's motion to dismiss. The logic and holding of Twombly indicate that the "no set of facts" language is similarly not applicable to a defendant's opposition to a plaintiff's motion for judgment on the pleadings, and that the motion should be granted if the plaintiff is entitled to relief. See, e.g., Southern Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, 479 F.2d 478, 480 (6th Cir. 1973) (a motion for judgment on the pleadings should be granted "if the moving party is . . . clearly entitled to judgment").

**B. Fed. R. Civ. P. 56(a).**

A plaintiff may move under Fed. R. Civ. P. 56(a) "for summary judgment on all or part of the claim." Here, Plaintiffs have moved for summary judgment on their claim that the challenged Statutes are facially unconstitutional. Fed. R. Civ. P. 56(c) provides that a judgment should be rendered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Plaintiffs contend that there are no material facts in dispute in this case involving their facial challenge to the state Statutes, and that they are entitled to judgment as a mater of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (a trial judge "shall . . . grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law"). As the Court made clear in Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986), "Rule 56 must be construed not only for the rights of persons asserting . . . defenses . . . but also for the rights of persons opposing such . . . defenses to demonstrate in the manner provided by the Rule, prior to trial, that the . . . defenses have no factual basis."

## IV.   THE FACTS ARE UNDISPUTED

Tennessee law denies voting rights to people convicted of a felony unless the state restores that right.  Tenn. Const. art. IV, § 2; Tenn. Code Ann. §§ 40-20-112, 40-29-201 – 205.  Voting rights cannot be restored, however, unless an ex-felon pays all LFOs in connection with a conviction or is current on child support payments.  Tenn. Code Ann. §§ 40-29-202(b) and 40-29-202(c).  Plaintiffs Johnson and Roberts were convicted of felonies and have completed their terms of imprisonment, parole, and probation for their offenses.  Despite that, they are not eligible to vote because they have not paid all their LFOs in connection with their conviction, or are not current on child support payments.  Decls. of Terrence Johnson and Joshua Roberts.

## V.   ARGUMENT

### A.   Tennessee's Re-Enfranchisement Scheme Is Subject To Strict Scrutiny Under The Equal Protection Clause And Is Facially Unconstitutional.

Section 1 of the Fourteenth Amendment guarantees the right of all citizens to equal protection under the law.  See Wesberry v. Sanders, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.").[2]  Because the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, the Court has characterized the right to vote as a fundamental political right.  Reynolds v. Sims, 377 U.S. 533, 562 (1964) (citing Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886)).  Because of the fundamental role voting has in the functioning of America's democratic institutions, "[a]ny unjustified discrimination in

_____

[2] The right to vote is in fact protected by more constitutional provisions than any right we have as Americans, i.e., the First, Fourteenth, Fifteenth, Nineteenth, Twenty-Fourth, and Twenty-Sixth Amendments.

determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government." Kramer v. Union Free Sch. No. 15, 395 U.S. 621, 626 (1969) (holding that state statute which limited franchise in certain school districts to owners or lessees of taxable property and parents or guardians of children in public schools violated the equal protection clause). In Richardson v. Ramirez, 418 U.S. 24, 56 (1974), the Court held that a state could, consistent with the Equal Protection Clause, exclude from the franchise convicted felons who had completed their sentences and paroles because "the exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment."[3] However, the Court "did not reach respondents' alternative contention that there was such a total lack of uniformity in county election officials' enforcement of the challenged state laws as to work a separate denial of equal protection." Id. Thus, merely because Richardson held that a state could exclude felons from the franchise, it does not stand for the proposition that constitutional standards do not apply to procedures adopted by a state to restore the right to vote. Felons may not have a right to vote, but they have a right to constitutional standards in the restoration of the right to vote.

In Bynum v. Conn. Comm'n on Forfeited Rights, 410 F.2d 173, 175-76 (2nd Cir.

---

[3] Section 2 of the Fourteenth Amendment provides: "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice-President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, **except for participation in rebellion, or other crime,** the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number the male citizens twenty-one years of age in such State" (emphasis added).

1969), the court recognized that the issue before it of whether a state, having agreed to permit ex-felons to regain their vote and having established administrative machinery for this purpose, can then deny access to this relief, solely because one is too poor to pay the required fee, was distinct from the question posed in Richardson. Accordingly, it concluded that the plaintiff's claim "is substantial," and reversed the lower court's denial of plaintiff's request for a three-judge court to determine the constitutionality of requiring payment of a fee for filing a petition to restore voting rights.

Nothing in Richardson holds or suggests that a constitutionally infirm re-enfranchisement scheme would have an affirmative sanction in Section 2 of the Fourteenth Amendment. Nor does Richardson insulate the Statutes from challenges to deprivations of the vote that impinge on the basic values enshrined in the Equal Protection Clause. In Hunter v. Underwood, 471 U.S. 222, 233 (1985), for example, the Court struck down Alabama's disfranchisement scheme in light of evidence that it was enacted to discriminate against African-Americans. Another example is Hobson v. Pow, 434 F. Supp. 362 (N.D. Ala. 1977), in which the court held that Alabama law disfranchising men, but not women, convicted of spousal abuse violated the Equal Protection Clause.

Defendants' contention that Tennessee's restoration of voting rights to people convicted of infamous crimes does not require any constitutional safeguards runs directly counter to Richardson, and Hunter, as well as Hobson. Although disfranchisement and re-enfranchisement statutes concern voters with criminal convictions, the laws are distinct in both purpose and effect. In light of the fundamental role that the right to vote plays in the legitimacy of America's representative system, extensions of the state's

7

narrow constitutional authority to abrogate that right should not be recognized unless specific textual support for such exemptions can be found in the Constitution. The Fourteenth Amendment contains no such language and the <u>Richardson</u> decision does not shield Tennessee's re-enfranchisement scheme from constitutional scrutiny.

While a state may deprive felons of the right to vote (even though it is not mandated), and may allow ex-felons to regain this fundamental right (also voluntary), it cannot do so in an unconstitutional manner. Disfranchising only African Americans or men, or limiting restoration of voting rights to Caucasians or women, would plainly violate the constitution. By the same token, limiting the restoration of voting rights to ex-felons based on their economic status should similarly be found unconstitutional..

> **1. The restoration of voting rights should not hinge on one's payment of, or ability to pay, LFOs.**

Whenever a state adopts a process for determining who is qualified to vote, individuals have a substantive right under the Equal Protection Clause to participate in elections on an equal basis as other qualified voters. <u>Lubin v. Parish</u>, 415 U.S. 709, 713 (1974). <u>See also</u> <u>Dunn v. Blumstein</u>, 405 U.S. 330, 336 (1972) (recognizing that "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction"). Once a state grants the right to vote on equal terms, it may not value one person's vote more than another's through either arbitrary or disparate treatment. <u>Bush v. Gore</u>, 531 U.S. 98, 104-05 (2000).

When determining whether or not a state election law or policy violates the Equal Protection Clause, a court must first consider the character and magnitude of the asserted injury to the rights that the Fourteenth Amendment protects. <u>Anderson v. Celebrezze</u>, 460 U.S. 780, 789 (1983) (applying strict scrutiny standard in ruling that an Ohio statute

which required independent candidates running for President to file their nomination papers earlier than political party candidates violated Equal Protection Clause). The court then should identify and evaluate the precise interests that the state puts forward to justify the burden that its law or policy imposes on a plaintiff. Id. "In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." Id. Once a state election law subjects equal protection rights to 'severe' restrictions, the state law must be "narrowly drawn to advance a state interest of compelling importance." Burdick v. Takushi, 504 U.S. 428, 434 (1992) (internal citations omitted). However, when the challenged law imposes only "reasonable, nondiscriminatory restrictions" upon a voter's equal protection rights, "the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." Id. at 434, citing Anderson, 460 U.S. at 788.

The Supreme Court has held that a state's sole interest when it comes to voting "is limited to the power to fix qualifications." Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 668 (1966). In Harper, the Court struck down a Virginia constitutional provision which required voters to pay a poll tax and held that "a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard." Id. at 666 (emphasis added). "[W]ealth or fee paying has . . . no relation to voting qualifications; the right to vote is too precious, too fundamental to be so burdened or conditioned." Id. at 670. The Court reasoned that "[w]ealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process" and that "[t]o introduce wealth or

9

payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor." <u>Id.</u> at 668. The Court further determined that the constitutional analysis would be the same regardless of "whether the citizen, otherwise qualified to vote, has $1.50 in his pocket or nothing at all, pays the fee or fails to pay it." <u>Id.</u> <u>See also</u> <u>Johnson v. Governor of State of Florida</u>, 405 F.3d 1214, 1216 n.1 (11th Cir. 2005) (relying upon <u>Harper</u> for the proposition that "[a]ccess to the franchise cannot be made to depend on an individual's financial resources").

Because the right to vote is fundamental, state statutes that distribute the vote to some citizens while denying it to others are subject to strict scrutiny. <u>Kramer</u>, 395 U.S. at 627. Such classifications "cannot be upheld unless . . . supported by sufficiently important state interests" that are "closely tailored to effectuate only those interests." <u>Zablocki v. Redhail</u>, 434 U.S. 374, 388 (1978). <u>See also</u> <u>Kramer</u>, 395 U.S. at 627 (exclusions from the franchise must be "necessary to promote a compelling state interest"); <u>Dunn v. Blumstein</u>, 405 U.S. at 343. Payment or non-payment of restitution is irrelevant to a voter's qualifications and, as such, voting should not hinge on payment of, or one's ability to pay, restitution.

The Court has invalidated wealth based qualifications in a variety of other contexts. In <u>M.L.B. v. S.L.J.</u>, 519 U.S. 102, 124 and n.14 (1996), relying upon <u>Harper</u> and other voting and ballot access cases, the Court invalidated under the Fourteenth Amendment a Mississippi statute which required the plaintiff to pay record preparation fees prior to appealing revocation of her parental rights. According to the Court, access to judicial processes cannot "turn on ability to pay." <u>Id.</u> In <u>Bearden v. Georgia</u>, 461 U.S. 660 (1983), the Court ruled that a state may not revoke an indigent defendant's probation

for failure to pay a fine and restitution without first determining whether the defendant made any bona fide attempts to pay the debt or whether an alternative form of punishment existed. The Court reasoned that "[t]o do otherwise would deprive the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine." Id. at 672-73.

In Zablocki, 434 U.S. at 389-91, the Court held that a Wisconsin statute that denied the fundamental right to marry to individuals who had, at the time they sought to marry, outstanding child support obligations violated the Equal Protection Clause. The Court ruled that the state law denying access to a fundamental right could not be justified merely because that law may, in some instances, provide an incentive for individuals to make support payments. Id. at 389. The Court also has invalidated laws that result in disparate treatment when it comes to collecting child support. For example, Stanton v. Stanton, 421 U.S. 7 (1975), involved a challenge to a Utah statute which set the age of majority for child support purposes as 18 for females and 21 for males. The Court held that males and females cannot be treated differently for child support purposes consistently with the Equal Protection Clause. Id. at 17. See also Pickett v.Brown, 462 U.S.1, 18 (1983) (striking down Tennessee statute which set two-year statute of limitations for establishing paternity in child support suits on grounds that law denied certain illegitimate children equal protection); McBee v. Sallee, 1980 WL 6452 (E.D. Tenn. 1986) (ruling that Tennessee policy which allowed families receiving public assistance to deduct $50 from any child support payment received when calculating financial need, but did not provide same offset when payments came from social security benefits violated the Equal Protection Clause).

Under Tennessee law, a parent who owes outstanding child support payments is only criminally liable if the failure to pay is intentional and the parent has the ability to pay. See Tenn. Code Ann. § 39-15-101(a) ("[a] person commits the crime of nonsupport who fails to provide support which that person is able to provide and knows the person has the duty to provide to a minor child."). A violation of § 39-15-101 is a Class A misdemeanor, if the violation is not flagrant, and does not result in the loss of voting rights. § 39-15-101(e). Thus, a person with no prior felony conviction who violates the child support law does not lose the right to vote and the right to vote never becomes contingent upon eliminating any arrearages. Although Plaintiffs maintain that the restitution requirement treats people convicted of infamous crimes differently based on wealth, the disparate treatment is even more stark when applied to people who owe outstanding child support based on their criminal history.

As in Harper, Tennessee's re-enfranchisement scheme makes the payment of LFOs an electoral standard for people convicted of infamous crimes who have otherwise completed all the requirements of their sentence and would otherwise be eligible to apply for a Certificate of Restoration. The sole distinction between people convicted of infamous crimes who are given access to the ballot and those who are denied access is the payment of money. This distinction violates the Equal Protection Clause.

> **2.** **Plaintiffs are not required to prove that the LFO requirement was adopted with a discriminatory purpose to establish a violation of the Equal Protection Clause.**

Plaintiffs have not argued that the challenged system was adopted with a discriminatory purpose, but rather that it has a discriminatory effect. The cases relied upon above make it abundantly clear that when a state law burdens a fundamental right,

such as the right to vote, a plaintiff need not show the law was enacted with a discriminatory purpose. In <u>Baker v. Carr</u>, 369 U.S. at 335, Justice Harlan noted in his dissenting opinion that the Tennessee plan which was held subject to challenge under the Fourteenth Amendment had not been drawn "with a deliberate purpose to dilute the voting strength of one race . . . or that some religious group is intentionally under represented." Similarly, in <u>Harper v. Virginia State Board of Elections</u>, 383 U.S. at 672, Justice Black pointed out in his dissenting opinion that "the Court's decision is to no extent based on a finding that the Virginia law as written or as applied is being used as a device or mechanism to deny Negro citizens of Virginia the right to vote on account of their color." In <u>Dunn v. Blumstein</u>, 405 U.S. at 355, the Court was explicit that "[w]e do not rely on this alleged original purpose of durational residence requirements [to deny the vote to undesirables] in striking them down today." There was no requirement of proof of a discriminatory purpose in other voting cases finding violations of the Equal Protection Clause, <u>e.g.</u>, <u>Reynolds v. Sims</u>, <u>Wesberry v. Sanders</u>, and <u>Kramer v. Union Free School No. 15</u>. <u>See also</u> <u>Dubay v. Wells</u>, 506 F.3d 422, 428 (6th Cir. 2007) ("[t]he Equal Protection Clause of the Fourteenth Amendment 'is essentially a direction that all persons similarly situated should be treated alike'").

The Supreme Court has held that denying a citizen access to a fundamental right – which Tennessee's felon re-enfranchisement scheme does – "for failing to do that which they cannot do" is irrational and cannot survive under any level of equal protection scrutiny. <u>Zablocki</u>, 434 U.S. at 394 (Stewart, J., concurring). Aside from its voting rights cases, the Court's decisions have consistently held that the existence of a fundamental right cannot be conditioned on the ability to pay, or the payment of a fee.

See Bearden v. Georgia, 461 U.S. at 671 ("the State cannot justify incarcerating a probationer who has demonstrated sufficient bona fide efforts to repay a debt to society solely by lumping him together with other poor persons and thereby classifying him as dangerous."); Griffin v. Illinois, 351 U.S. 12, 19 (1956) (invalidating a state practice of granting appellate review only to persons who could afford a trial transcript); Douglas v. California, 372 U.S. 353 (1963) (indigent entitled to counsel on first direct appeal); Roberts v. LaVallee, 389 U.S. 40 (1967) (indigent entitled to free transcript of preliminary hearing); Mayer v. Chicago, 404 U.S. 189 (1971) (indigent cannot be denied an adequate record on appeal). All of these cases strongly support Plaintiffs' argument that there can be no equal justice where regaining the right to vote depends on the amount of money a person has, or the payment of a fee. And as noted above, the Court's decision in Richardson, 418 U.S. at 56, remanding the case to determine whether counties in California were enforcing the state's restoration law unequally "as to work a separate denial of equal protection," shows that an allegation or finding of a discriminatory purpose is not required in a challenge to a state's re-enfranchisement process.

The completion of a prison sentence, probation, and parole is something that all convicted felons are capable of doing. The payment of LFOs, including court fees, restitution, and interest, is fundamentally different because it depends on a person's wealth, and negatively impacts those who are incapable of paying. Some ex-felons are able to pay these obligations immediately after completing prison, probation and parole. Those who pay the fees and restitution are able to vote, and those who do not are unable to vote. The only bar to the right to vote for people in the second group is their inability

14

to pay. Thus, as Plaintiffs allege in their Complaint, Defendants are unlawfully disfranchising poor people by requiring the payment of LFOs whether or not they are doing so with a discriminatory purpose.

### 3. Tennessee's denial of voting rights to people with felony convictions does not achieve the interests Defendants assert.

Plaintiffs maintain that the state's re-enfranchisement scheme is subject to strict scrutiny. However, even if this Court finds that heightened scrutiny is not appropriate in this case, the state's classification must still be rejected on equal protection grounds because it is not rationally related to any state interest. Defendants' asserted interests do not take into consideration those individuals who lack the economic means to meet their financial obligations which even Tennessee's own child support law does when establishing guilt. See Tenn. Code Ann. § 39-15-101(a). In addition, the Supreme Court has stated that "the use of the franchise to compel compliance with other, independent state objectives is questionable in any context." Hill v. Stone, 421 U.S. 289, 299 (1975). See also Carrington v. Rash, 380 U.S. 89, 96 (1965) ("States may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State"); Harmon v. Forssenius, 380 U.S. 528, 542 (1965) ("constitutional deprivations may not be justified by some remote administrative benefit to the State"). As the Court explained in City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 446 (1985), even in the absence of heightened scrutiny, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." The Court also has ruled that, if there are alternative means to achieve the state's interests without burdening the right to vote, the State must choose those "less

drastic means." <u>Dunn</u>, 405 U.S. at 343.

Tennessee has other available means by which to collect child support and restitution such as executing a lien on the person's real or personal property (Tenn. Code Ann. § 36-5-901), garnishing the person's wages (Tenn. Code Ann. § 36-5-1101, et seq.), and holding the person in contempt for willfully failing to pay (Tenn. Code Ann. § 40-24-105). There is no reason to believe that the non-payment of an often sizeable financial obligation immediately upon release from supervision can in any way be used as a proxy for determining a citizen's commitment to abide by the laws. If anything, the LFO requirement creates a serious barrier for purposes of rehabilitation and reintegration into society, especially in this case where Plaintiffs obviously want to participate in the political process.

In light of the array of other collection devices available to the state, it is difficult to imagine how the denial of the fundamental right to vote makes available any additional financial resources that are not already otherwise accessible. This is particularly true with regard to those who are indigent. As the Supreme Court has recognized, denying a citizen access to a fundamental right "for failing to do that which they cannot do" is irrational and cannot survive under any level of judicial scrutiny. <u>Zablocki</u>, 434 U.S. at 394 (Stewart, J., concurring); <u>See also</u> <u>Bearden</u>, 461 U.S. at 671 ("the State cannot justify incarcerating a probationer who has demonstrated sufficient bona fide efforts to repay his debt to society solely by lumping him together with other poor persons and thereby classifying him as dangerous. This would be little more than punishing a person for his poverty."). Because the relationship between the State's re-enfranchisement classification and its asserted goals is attenuated at best, the

classification cannot be found to have a rational basis. Tennessee's re-enfranchisement scheme unnecessarily locks out a substantial number of its citizens from the procedures available to regain the fundamental right to vote. Because this restriction cannot survive scrutiny under a strict or rational basis standard, the law facially violates the Fourteenth Amendment's Equal Protection Clause and cannot stand. Further, it appears that the state's purported interests are pretextual because if the state were really interested in protecting the ballot box from individuals who failed to pay child support, the prohibition would apply to all individuals, not just those who have felony convictions.

      **B.    Tennessee's Requirement That Plaintiffs Pay LFOs Prior To Getting Their Voting Rights Restored Is Equivalent To A Poll Tax And Violates The Twenty-Fourth Amendment.**

The Twenty-Fourth Amendment provides that a citizen's right to vote in federal elections "shall not be denied or abridged by the United States or any state by reason of failure to pay any poll tax or other tax." Congress adopted the Twenty-Fourth Amendment for a variety of reasons - concern that states were enacting poll taxes for a racially discriminatory purpose, the payment deadlines did not allow candidates sufficient time to build a base of supporters, and political parties were exerting their wealth to secure blocks of voters. <u>Harmon</u>, 380 U.S. at 539-40. Congress also expressed "a general repugnance to the disenfranchisement of the poor occasioned by failure to pay the tax." <u>Id.</u> The purpose of the amendment, as stated in the House Committee Report, was "to prevent the United States or any State from denying or abridging the right of the citizens of the United States to vote . . . because of an individual's failure to pay any poll tax or other tax." H.R. Rep. No. 87-1821, at 2 (1962), reprinted in 1962 U.S.C.C.A.N. 4033. The House Judiciary Committee concluded that the poll tax was "merely an

obstacle to the proper exercise of a citizen's franchise," and the Attorney General stated that his main objection to the poll tax was that "it clogs voter registration and limits participation in the processes of government."  Id. at 2, 4.  In a House floor debate, one of the amendment's proponents stated that "the payment of money . . . should never be permitted to reign as a criterion of democracy."  87 Cong. Rec. 17657 (1962) (statement of Rep. Fascell).

By passing the Twenty-Fourth Amendment, Congress and the states were insisting that a price should not be placed on the right to vote, and that when it is, it is nothing more than an impediment to a citizen's exercise of a fundamental right. Congress likened the poll tax to property requirements, and found that a person's wealth has no place in determining a person's right to vote.  The Twenty-Fourth Amendment's primary purpose was to eliminate an unnecessary and unfair obstacle to voting and to encourage the electorate to be more active in the political process.

In Harmon, 380 U.S. at 544, the Supreme Court ruled that a provision of the Virginia Code which required people voting in federal elections to either pay a poll tax or file a certificate of residence violated the Twenty-Fourth Amendment.   The Court found that the poll tax requirement undermined many of the concerns that Congress intended the Twenty-Fourth Amendment to alleviate and that the administrative process for obtaining a certificate was too burdensome on voters.  Id. at 541-42, 544.  In Common Cause/Georgia v. Billups, 406 F. Supp. 2d 1326, 1366-67 (N.D. Ga. 2005),  the plaintiffs sought a preliminary injunction enjoining the state from requiring people voting in person to present government-issued photo identification.  The plaintiffs argued that the fee associated with obtaining the identification was in the nature of a poll tax in violation

of the Twenty-Fourth Amendment. In granting the injunction, the court found that paying for the identification was a material requirement in order to vote and, therefore, the law's inclusion of a fee waiver option was irrelevant for purposes of evaluating its constitutionality under the Twenty-Fourth Amendment. Id. at 1370. The court reasoned that the Twenty-Fourth Amendment "does not merely insure that the franchise shall not be 'denied' by reason of failure to pay the poll tax; it expressly guarantees that the right to vote shall not be 'denied or abridged' for that reason." Id. at 1367.

The completion of a prison sentence, probation, and parole is something that all convicted felons are capable of doing. The payment of LFOs, including court fees, restitution, and interest, is fundamentally different because it does depend on a person's wealth, and discriminates against those who are incapable of paying. Plaintiffs allege that the LFO requirement has a disparate impact on indigent people and an indigent person most likely is simply unable to pay all of their LFOs. Some people convicted of infamous crimes, conversely, are able to pay these obligations immediately after completing prison, probation and parole. The only bar to the right to vote for those in the first group is their inability to pay. Those who pay the fees and restitution are able to vote, and those who do not are unable to vote. The state Statutes thus make affluence or the payment of any fee an electoral standard .

In practical application, Tennessee's requirement that a person pay all restitution and be current on any child support payments is precisely the "disenfranchisement of the poor" that Congress sought to abolish with passage of the Twenty-Fourth Amendment. Harman, 380 U.S. 539. The LFO requirement is an absolute bar for those who are otherwise eligible to vote, but simply cannot afford to pay, and it disfranchises the poor,

often permanently, in violation of the Twenty-Fourth Amendment.

### C. Tennessee's LFO Requirement Violates The Ex Post Facto Clause of the Tennessee Constitution.

Article 1, Section 11 of the Tennessee Constitution states that "laws made for the punishment of acts committed previous to the existence of such laws, and by them only declared criminal, are contrary to the principles of a free Government; wherefore no Ex post facto law shall be made." The U.S. Constitution also prohibits the passage of ex post facto laws. U.S. Const. art. 1, § 9. Courts have held that the Ex Post Facto Clause "is aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" California Dep't of Corrections v. Morales, 514 U.S. 499, 504 (1995) (internal citations omitted); Carmell v. Texas, 529 U.S. 513, 524-25 (2000) ("the words ex post facto laws were technical expressions, and meant every law . . . which changed the punishment, and inflicted a greater punishment than the law annexed to the crime when committed") (internal citations omitted); State v. Odom, 137 S.W.3d 572 (Tenn. 2007) (same).

Earlier this year, the Tennessee Supreme Court ruled that "laws disenfranchising convicted felons are penal in nature." May v. Carlton, 245 S.W.3d 340 (Tenn. 2008). In May, the petitioner sought habeas corpus relief from a judgment which declared his offense as "infamous" even though, at the time of sentencing, the legislature had not declared the crime as infamous. Id. at 342. In granting the habeas corpus petition, the court reasoned that "[b]ecause the right to vote is fundamental to the concept of liberty in [Tennessee], an erroneous label of infamy in a judgment of conviction . . . should be declared null and void." Id. at 349. See also Gaskin v. Collins, 661 S.W.2d 865, 868 (Tenn. 1983) (the Ex Post Facto Clause of the Tennessee Constitution "prohibits the

General Assembly from retroactively disenfranchising convicted felons who have never been adjudged infamous"). The fact that Tennessee's re-enfranchisement Statutes are found in the "Criminal Procedure" section of the Tennessee Code further establishes that the Statutes impose an additional criminal penalty for a conviction.

Tenn. Code Ann. §§ 40-29-202(b) and 40-29-202(c) were enacted in 2006. Prior to 2006, Tennessee's re-enfranchisement law did not require a person to pay all of their restitution or be current on child support payments. Under the old law, Plaintiffs, who were convicted before 2006, would have been eligible to get their voting rights restored. Thus, the application of § 40-29-202(b) and 40-29-202(c) to Plaintiffs is retroactive and the laws increase the penalties that Plaintiffs faced when they were convicted. Regardless of how this Court rules on the federal Ex Post Facto Clause claim, Tennessee's LFO requirement, as it applies to Plaintiffs, violates the state Ex Post Facto Clause, and this Court is bound by the state supreme court's interpretation of state law. Medellin v. Texas, 128 S. Ct. 1346, 1364 (2008). See also Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[w]e have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus").

### D. Tennessee's LFO Requirement Violates the Federal and State Privileges and Immunities Clauses.

Section 1 of the Fourteenth Amendment provides that: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." Article XI, Section 8 of the Tennessee Constitution states that the Tennessee Legislature "shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of individuals inconsistent with

the general laws of the land; nor to pass any law granting to any individual or individuals,
rights, privileges, immunities, or exemptions other than such as may be, by the same law
extended to any member of the community, who may be able to bring himself within the
provisions of such law."

Tennessee courts have interpreted the state's Privileges and Immunities Clause as
ensuring the same protections as the Equal Protection Clause. Harrison v. Schrader, 569
S.W.2d 822, 825 (Tenn. 1978); Baker v. Vanderbilt Univ., 616 F. Supp. 330, 332-33
(M.D. Tenn. 1985). When examining a state election law under the Privileges and
Immunities Clause, courts should not only look at the face of the statute, but also at
whether the law has a disparate impact on a particular group of persons. See Anderson v.
Celebrezze, 460 U.S. at 789. Even though Tennessee's LFO requirement may appear
neutral on its face, the law negatively and disproportionately impacts indigent people.
The result is that poor people, many of whom were already poor and disadvantaged in
areas such as education, employment, and housing, are further locked out of the political
process.

Moreover, as Plaintiffs have argued above, the state's LFO requirement is not
rationally related to the state's asserted interests and does not serve a compelling
governmental interest. Instead, the law further expands the already wide gulf between
the wealthy and the poor when it comes to the exercise of voting rights even among the
class of felons and, in many instances, serves to permanently disfranchise indigent people
in violation of the state and federal privileges and immunities clause.

## VI.    __CONCLUSION__

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their

motion for judgment on the pleadings or in the alternative their motion for partial summary judgment.

DATED this 22nd day of August 2008.

Respectfully submitted,

By:  /s/ Nancy Abudu
Nancy G. Abudu*
Laughlin McDonald*
Neil Bradley*
AMERICAN CIVIL LIBERTIES UNION
  VOTING RIGHTS PROJECT
230 Peachtree Street NW
Suite 1440
Atlanta, Georgia  30303
Tel: (404) 523-2721
Fax: (404) 653-0331
lmcdonald@aclu.org
nbradely@aclu.org
nabudu@aclu.org
*Admitted pro hac vice

Tricia Herzfeld (Bar No. 026014)
AMERICAN CIVIL LIBERTIES UNION
  OF TENNESSEE
P.O. Box 120160
Nashville, Tennessee 37212
Tel: (615) 320-7142
Fax: (615) 320-7260
tricia@aclu-tn.org

Counsel for Plaintiffs

23

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of August 2008, a copy of the foregoing was served on counsel of record for defendants, addressed as follows, via the court's electronic filing system:

ROBERT E. COOPER, JR.
JANET M. KLEINFELTER
WILLIAM N. HELOU
Special Litigation Division
425 5th Avenue North
Nashville, Tennessee 37243

SUE B.CAIN
ALLISON BUSSELL
108 Metropolitan Courthouse
P.O. Box 196300
Nashville, Tennessee 37219

JOHN L. RYDER
One Commerce Square, Suite 2700
Memphis, Tennessee 38103

DANIEL PRESLEY
160 North Main Street, Suite 2700
Memphis, Tennessee 38103

JAMES I. PENTECOST
JON A. YORK
106 Stonebridge Blvd.
Jackson, TN 38305

/s/ Nancy Abudu
Nancy Abudu

Counsel for Plaintiffs