IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TERRENCE JOHNSON, JIM HARRIS,           )
ALEXANDER FRIEDMANN, and                )
JOSHUA ROBERTS,                         )
                                        )
        Plaintiffs,                     )
                                        )
v.                                      )   Case No. 3:08cv0187
                                        )
PHIL BREDESEN, Governor of the State of )   Judge Thomas A. Wiseman, Jr.
Tennessee, BROOK THOMPSON,              )
Coordinator of Elections, RILEY DARNELL,)
Secretary of State of Tennessee, JAMES  )
JOHNSON, Administrator of Elections for )
Shelby County, KIM BUCKLEY, Administrator of )
Elections for Madison County, and       )
RAY BARRETT, Administrator of Elections for )
Davidson County, in their official capacities, )
                                        )
        Defendants.                     )

MEMORANDUM OPINION

Before the Court are (1) a Motion for Judgment on the Pleadings as to the Constitutional

Challenges Contained in the Amended Complaint (Doc. No. 58) filed by defendants Phil Bredesen, Brook

Thompson and Riley Darnell (collectively, the "State Officials"), and (2) Plaintiffs' Motion for Judgment on

the Pleadings or in the Alternative Motion for Partial Summary Judgment (Doc. No. 68).  The motions

have been fully briefed and the parties presented oral argument on their motions at a hearing conducted

on September 15, 2008.

For the reasons set forth below the Court finds that the State Officials' motion is meritorious and

that they are entitled to judgment in their favor as a matter of law as to Counts One through Five of the

Amended Complaint.  Those Counts will be dismissed, leaving for adjudication only plaintiff Alexander

Friedmann's due-process claims under the United States and Tennessee Constitutions, set forth in Count

Six of the Amended Complaint.  Plaintiffs' motion for judgment will be denied.

I.      INTRODUCTION

After this Court issued its Memorandum Opinion and Order (Doc. Nos. 44 and 45) denying the

County Official defendants' motions to dismiss, plaintiffs filed an Amended Complaint (Doc. No. 57) in

which they joined a new plaintiff, Joshua Roberts. In the Amended Complaint as in the original Complaint, Plaintiffs seek to invalidate those portions of Tenn. Code Ann. § 40-29-202 that condition the restoration of voting rights for people previously convicted of a felony upon their payment of certain legal financial obligations, namely restitution and child support. Plaintiffs assert that this statute, by denying the vote to those who have not satisfied certain legal financial obligations, violates their fundamental right to vote and discriminates among citizens on the basis of wealth. More specifically, Plaintiffs claim that the statutory provisions at issue violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (Counts One and Two), the Twenty-Fourth Amendment to the United States Constitution ("Count Three"), the Ex Post-Facto Clauses of the United States and Tennessee Constitutions ("Count Four"), and the Privileges and Immunities Clauses of the United States and Tennessee Constitutions ("Count Five"). Count Six of the Amended Complaint asserts that the State of Tennessee has refused to restore plaintiff Alexander Friedmann's voting rights despite the State's failure to produce any documentation showing Mr. Friedmann owes outstanding restitution, in violation of the Due Process Clauses of the United States and Tennessee Constitutions. Plaintiffs name as defendants those state and county officials, in their official capacity, they allege are responsible for the implementation and enforcement of the state statutory scheme as it pertains to voter eligibility and registration. They seek declaratory and injunctive relief, nominal damages, attorney's fees and costs.

The State Officials have now filed their motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure, asserting that, even assuming the Plaintiffs' factual allegations are true, they are not entitled to any relief on Counts One through Five of the Amended Complaint.[1] Plaintiffs oppose the State Officials' motion, but they have also filed their own motion for judgment on the pleadings and alternative motion for partial summary judgment as to Counts One through Five.

## II.     FACTUAL BACKGROUND

The facts are undisputed for purposes of the parties' motions. Under current Tennessee law, a citizen convicted of a felony and thereby deprived of the right to vote can apply for a voter registration card and seek to regain the right of suffrage upon:

> (1) Receiving a pardon, except where the pardon contains special conditions pertaining to the right of suffrage;

---

[1] Count Six is not at issue in the State Officials' motion.

>(2) The discharge from custody by reason of service or expiration of the maximum sentence imposed by the court for the infamous crime; or
>
>(3) Being granted a certificate of final discharge from supervision by the board of probation and parole pursuant to § 40-28-105, or any equivalent discharge by another state, the federal government, or county correction authority.

Tenn. Code Ann. § 40-29-202(a) (2006). Notwithstanding this provision, convicted felons remain ineligible to apply for a voter registration card or to have the right to suffrage restored unless they have "paid all restitution to the victim or victims of the offense ordered by the court as part of the sentence," Tenn. Code Ann. § 40-29-202(b), and unless they are "current in all child support obligations." Tenn. Code Ann. § 40-29-202(c).

Plaintiffs Terrence Johnson, Jim Harris and Joshua Roberts are all convicted felons and residents of Tennessee who have served their prison sentences and satisfied the conditions of supervised release, and wish to vote in upcoming elections. They are ineligible under § 40-29-202 to apply for restoration of their voting rights, however, because they owe past-due child support payments and/or restitution to the victims of the crimes for which they were convicted.

## II.       STANDARD OF REVIEW

A motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure applies the same standards as a motion to dismiss under Rule 12(b)(6). *Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007); *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006). Under the applicable standard, the court reviews the complaint in the light most favorable to the non-moving party, accepting as true all well pleaded factual allegations. *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) (citing *United States v. Moriarty*, 8 F.3d 329, 332 (6th Cir. 1993)). The court need not accept as true legal conclusions or unwarranted factual inferences contained in the pleadings. *Id.* (citing *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)). To survive the motion, "the complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory." *Id.* (citing *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005)). S*ee also Shuptrine v. McDougal Littell*, No. 1:07-cv-181, 2008 WL 400453, at * 1 (E.D. Tenn. Feb.12, 2008) (ruling on a Rule 12(c) motion and identifying the standard for a motion to dismiss under Rule 12(b)(6), in light of *Bell Atl. Corp. v. Twombly*, — U.S. —, 127 S. Ct. 1955, 1974 (2007), as whether the complaint pleads enough facts to

state a claim to relief that is plausible on its face).

Although Plaintiffs' motion, like the State Officials', is characterized first as a motion for judgment on the pleadings, the only pleading the Court can consider is the Amended Complaint, as the State Officials have not filed an answer to the Amended Complaint. They did file an answer to the original complaint in which they denied or were without sufficient information to admit or deny most of the factual allegations in the complaint. Regardless, there is no dispute regarding the import and effect of the statutes at issue, and the State Officials, for purposes of the Plaintiffs' motion, do not dispute those facts set forth in the Plaintiffs' Statement of Material Facts. It appears that the issues presented are strictly legal in nature and do not require the resolution of any factual issues in any party's favor.[2]

III.    **ANALYSIS AND DISCUSSION**

   A.    **Whether § 40-29-202 Violates the Equal Protection Clause**

The State Officials argue that subsections (b) and (c) of § 40-29-202 do not violate the Equal Protection Clause of the United States Constitution because: (1) felons do not have a fundamental right to vote; (2) wealth qualifications do not discriminate against a suspect class; and (3) because felons do not have a fundamental right to vote, the statutory limitations on restoration of felon voting rights are subject to a rational-basis analysis, which the State meets. In response, Plaintiffs do not dispute that the State may disenfranchise convicted felons, but essentially argues that once the right to vote is restored, any restrictions on that right should be subject to strict scrutiny. They also argue that § 40-29-202 has a disparate impact on the indigent. Finally, they argue that the distinction made by the statute between those ex-felons who can and cannot pay restitution and past-due child support is not rationally related to any legitimate government purpose and, alternatively, that they should be able to conduct discovery in order to present evidence invalidating Defendants' asserted rational basis for the statute. The law simply does not support the Plaintiffs' arguments.

   *(1)    Convicted Felons Do Not Have Fundamental Right to Vote*

The Supreme Court has expressly stated that "the exclusion of felons from the vote has an affirmative sanction in [§] 2 of the Fourteenth Amendment." *Richardson v. Ramirez*, 418 U.S. 24, 54

---

[2] The State Officials do contest the Plaintiffs' factual assertion that the challenged statutory provisions disproportionately affect the indigent.

(1974).  Based on that finding, the Court held that the California Supreme Court had erred in holding that California's exclusion of convicted felons who had completed their sentences and paroles from the franchise violated the Equal Protection Clause of the Fourteenth Amendment.  *Id.* at 56.  The Sixth Circuit has interpreted *Richardson v. Ramirez* to mean that felons do not have a fundamental right to vote.  *See Wesley v. Collins*, 791 F.2d 1255, 1261 (6th Cir. 1986) ("It is undisputed that a state may constitutionally disenfranchise convicted felons . . . and that the right of felons to vote is not fundamental."  (citations omitted)).

*(2)*      ***Restrictions on Felons' Right to Vote Are Subject to Rational-Basis Test***

Other circuits, based on the holding in *Richardson* that felons do not have a fundamental right to vote, have applied the "rational-basis" test rather than strict scrutiny to distinctions among different types of convicted felons with respect to the right to vote.  For instance, *Shepherd v. Trevino*, 575 F.2d 1110 (5th Cir. 1978), involved a state statutory scheme that disenfranchised all convicted felons but provided a mechanism for the restoration of voting rights only to those who were convicted in state court and whose convictions were abrogated either by executive pardon or by act of the court of conviction.  The statutory scheme did not provide any means for the re-enfranchisement of felons convicted by federal courts unless they received a presidential pardon, over which the state had no control.  Plaintiffs, all felons convicted in federal court, asserted that the state statutory scheme violated their equal-protection rights because it provided no mechanism by which they could restore their voting rights.  In support of their position, the plaintiffs argued that *Richardson* should be read to mean "only that the state can deprive felons of the right to vote" but that "when a state grants the right to vote to some felons and denies it to others the classifications must be judged by strict scrutiny."  *Id.* 1114.  The Fifth Circuit rejected that argument as premised upon too narrow a reading of *Richardson*, stating:

> We do not read *Richardson* to hold that the realm of state discretion in disenfranchising persons convicted of felonies is limited to the disenfranchisement of all felons or none. While a narrow reading of *Richardson* might support plaintiffs' position, several aspects of the Court's opinion lead us to conclude that section 2 of the fourteenth amendment blunts the full force of section 1's equal protection clause with respect to the voting rights of felons.  First, the Court noted that it had previously "indicated approval" of a state's disenfranchisement of "some or all convicted felons."  418 U.S. at 53.  Second, the issue before the Court was whether California could deny the vote to the class of ex-felons who had completed their sentences and paroles.  *See* 418 U.S. at 32 n.10, 33, 56.  Thus, although the analysis engaged in by the Court focuses on a state's power to disenfranchise persons convicted of a felony generally, the specific holding of the Court was that a state may deny the franchise to that group of "convicted felons who have

completed their sentences and paroles."  418 U.S. at 56.  Third, the Court responded to arguments that a state should reenfranchise felons once they have served their terms by saying that such arguments should be directed to the state legislatures.  418 U.S. at 55. Thus, the Court clearly envisioned that a state could grant the right to vote to some persons convicted of a felony while denying it to others.  Section 2's express approval of the disenfranchisement of felons thus grants to the states a realm of discretion in the disenfranchisement and reenfranchisement of felons which the states do not possess with respect to limiting the franchise of other citizens.

*Shepherd*, 575 F.2d at 1114.

The Fifth Circuit went on, however, to find that § 2 of the Fourteenth Amendment could not be read to "remove[ ] all equal protection considerations from state-created classifications denying the right to vote to some felons while granting it to others."  *Id.*  For instance, the court observed, "[n]o one would contend that section 2 permits a state to disenfranchise all felons and then reenfranchise only those who are, say, white.  Nor can we believe that section 2 would permit a state to make a completely arbitrary distinction between groups of felons with respect to the right to vote."  *Id.* (citations omitted).  The court therefore held that "selective disenfranchisement or reenfranchisement of convicted felons must pass the standard level of scrutiny applied to state laws allegedly violating the equal protection clause.  Such laws must bear a *rational relationship to the achieving of a legitimate state interest.*"  *Id.* at 1114–15 (citing *McGowan v. Maryland*, 366 U.S. 420 (1961)) (emphasis added).

Similarly, in *Owens v. Barnes*, 711 F.2d 25 (3d Cir. 1983), the Third Circuit held that a Pennsylvania law that permitted unincarcerated felons to vote but barred incarcerated felons from voting did not violate the equal-protection clause so long as the distinction was "rationally related to a legitimate state interest."  *Id.* at 27 (noting that "[i]t follow[ed] [from the Supreme Court's holding in *Richardson*] that the standard of equal protection scrutiny to be applied when the state makes classifications relating to disenfranchisement of felons is the traditional rational basis standard").  Further, in finding that Pennsylvania's distinction between incarcerated and unincarcerated felons satisfied rational-basis scrutiny, the Third Circuit determined that it was "not bound by the state's inexplicable failure to provide in its brief any rationale for such distinction, . . because we believe the basis is apparent on its face."  *Id.* at 28.  More specifically, the court found that the state could rationally decide that one of the losses to which an incarcerated prisoner should be subject was that of participation in the democratic process.[3]

_____

[3] The cases cited by the Plaintiffs are not inconsistent with the above-referenced decisions.  For instance, in *Hunter v. Underwood*, 471 U.S. 222, 223 (1985), plaintiffs brought an action challenging a

Based on the above-referenced cases, this Court also finds, as the State Officials argue, that, because felons do not have a fundamental right to vote, the state's decision to restore voting rights to some convicted felons and not to others is not subject to a strict-scrutiny standard. Rather, the Court must find that such distinctions do not violate equal protection so long as they do not discriminate against a protected class and they bear a rational relationship to a legitimate state interest.

### *(3)    Indigence Is Not a Suspect Classification.*

Plaintiffs argue here that the state's discrimination between those felons who are able to pay all restitution ordered by the court as well as any past-due child support payments, and those who are not, amounts to a classification based upon wealth. Supreme Court precedent, however, has clearly established that wealth, or lack thereof, is not a "suspect classification." For instance, in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973), the Court upheld Texas's system of financing its public schools against an equal-protection challenge, where the funding scheme in question, financed in part by local property taxes, resulted in "substantial interdistrict disparities in school expenditures . . . throughout the State." *Id.* at 15. Notably, for purposes of the case at bar, the Supreme

---

state law disenfranchising persons convicted of "crimes involving moral turpitude." The Supreme Court affirmed the Eleventh Circuit's determination that the provision violated equal protection where it both had a disparate racial impact and was indisputably motivated by a desire to discriminate against blacks on the basis of race. *Hunter* is distinguishable from the case at bar because, among other factors, (1) the *Hunter* plaintiffs challenged the statutory provision only insofar as it barred those convicted of a misdemeanor from voting, rather than a felony; and (2) the provision was affirmatively shown to have a disparate impact upon and to be intended to discriminate on the basis of race – a suspect classification. Likewise, in the earlier case of *Hobson v Pow*, 434 F. Supp. 362 (N.D. Ala. 1977), the district court applied strict scrutiny to Alabama constitutional and statutory provisions that disenfranchised men upon conviction for "assault and battery on the wife," a misdemeanor, and held that the state had not met the requirement that it show the statute was narrowly tailored to further a compelling state interest, or even a rational basis for disenfranchising wifebeaters but not others convicted of assault and battery. In other words, *Hobson*, like *Hunter*, involved a misdemeanor rather a felony and also concerned a suspect classification: gender. Moreover, *Hobson*, being a district court decision from a different state and circuit, has no precedential value even if it were on point.

Plaintiffs' emphasis on *Burdick v. Takushi*, 504 U.S. 428 (1992), and *Anderson v. Celebrezze*, 460 U.S. 780 (1983), is similarly unpersuasive, as the Supreme Court in both those cases began its analysis with the presumption that the petitioning voters had a fundamental right to vote, and from there proceeded to determine whether certain limitations imposed on that right are permissible under the circumstances presented. Plaintiffs here, having been convicted of felonies and accordingly stripped of the right to vote among many other privileges and rights associated with citizenship, no longer have a fundamental right to vote. The Court's holding in *Richardson v. Ramirez*, 418 U.S. 24 (1974), continues to control that issue.

Court, in examining the equal-protection status of these disparities, "declined to apply any heightened scrutiny based either on wealth as a suspect classification or on education as a fundamental right." *Papasan v. Allain*, 478 U.S. 265, 283–84 (citing *Rodriguez*, 411 U.S. at 35). Because public education, though important, was "not among the rights afforded explicit protection under our Federal Constitution," *Rodriguez*, 411 U.S. at 35, the Court concluded that the State's school financing scheme, even though it resulted in funding disparities based on wealth, would be constitutional if it bore "some rational relationship to a legitimate state purpose." *Id.* at 44; *cf. Papasan*, 478 U.S. at 289–92 (likewise concluding that wealth was not a suspect classification, such that the unequal distribution of funding to different school districts was subject to the rational-basis standard, but remanding for reconsideration of the issue under the particular facts of that case). *Cf. Robinson v. Fauver*, 932 F. Supp. 639, 644 (D.N.J. 1996) (stating, for purposes of analyzing a prison inmate's assertion that a New Jersey statute violated his right to equal protection by discriminating on the basis of indigence, "[w]ealth . . . is not, alone, a suspect class for purposes of equal protection analysis" (citing *Rodriguez*, 411 U.S. at 24)). *See also Romer v. Evans*, 517 U.S. 620, 635 (1996) (holding that a law targeting a non-suspect class of people, in that case gays and lesbians, "must bear a rational relationship to a legitimate governmental purpose").

The cases cited by Plaintiffs do not lead to a different conclusion. Because wealth is not a suspect classification, the Court must uphold the statutory scheme challenged by the Plaintiffs unless it is not rationally related to a legitimate state purpose.

### *(4)    Section 40-29-202 Passes the Rational-Basis Test*

The "rational-basis" standard of review of a challenged state statute is extremely deferential to the State. As the Supreme Court has emphatically stated:

> [E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is *any reasonably conceivable state of facts that could provide a rational basis for the classification.* Where there are plausible reasons for Congress' action, our inquiry is at an end. This standard of review is a paradigm of judicial restraint. The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.

*FCC v. Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993) (internal quotation marks and citations omitted).

Accordingly, the statute at issues bears "a strong presumption of validity," *id.* at 314–15 (citing *Lyng v.*

*Auto. Workers*, 485 U.S. 360, 370 (1988)), and the Plaintiffs, not the State, bear the burden "to negative every conceivable basis which might support it," *id.* at 315 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

The State Officials suggest several alternative bases in support of § 40-29-202, subparts (b) and (c): (1) that the State has a legitimate interest in protecting the ballot box from felons who continue to break the law by not abiding by enforceable court orders (whether to pay restitution or child support), and that § 40-29-202 is rationally related to this legitimate state interest; (2) that the state has a strong public policy interest in encouraging the payment of child support and thereby promoting the welfare of children, and prohibiting the re-enfranchisement of ex-felons who owe back child support is rationally related to that legitimate state interest; and (3) that the State has a legitimate interest in encouraging convicted felons to complete their entire sentences, including the payment of restitution, and withholding the restoration of voting rights from felons who have not completed their entire sentence is rationally related to that legitimate State objective. The Court further observes that the State may legitimately determine that only those convicted felons who have fully paid all restitution ordered as part of their sentence are sufficiently rehabilitated to be entitled to vote. *Cf. Shepherd v. Trevino*, 575 F.2d 1110, 1115 (5th Cir. 1978) (holding that the Texas system for restoring convicted felons to the franchise, which only provided a mechanism for restoration of voting rights to those felons convicted in state as opposed to federal court, bore a rational relationship to the state's interest in limiting the franchise to "responsible voters"); *Coronado v. Napolitano,* No. CV-07-1089-PHX-SMM, 2008 WL 191987, at *4 (D. Ariz. Jan. 22, 2008) (recognizing that rehabilitation is one of the goals of requiring restitution as part of a criminal sentence, and holding that requiring payment in full of restitution is rationally related to that legitimate governmental interest).

In light of the highly deferential rational-basis analysis, the Court is compelled to find that the challenged statutory provisions are rationally related to legitimate state interests and therefore do not violate Plaintiffs' right to equal protection. With regard to Plaintiffs' insistence that they should be able to conduct discovery and present evidence to rebut the State Officials' asserted rational bases for the statute, the law, again, simply does not support Plaintiffs' position. As the Supreme Court has stated:

> [B]ecause we never require a legislature to articulate its reasons for enacting a statute, it
> is entirely irrelevant for constitutional purposes whether the conceived reason for the

challenged distinction actually motivated the legislature. . . .  In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.

*FCC v. Beach Commc'ns*, 508 U.S. at 315.  Accordingly, although the burden is clearly upon the Plaintiffs as the challenging party "to negative any reasonably conceivable state of facts that could provide a rational basis for the classification," *Bd. of Trustees v. Garrett* 531 U.S. 356, 360 (2001) (internal quotation marks and citations omitted), Plaintiffs must carry that burden by resorting to logic rather than to discovery.

They attempt to do so by insisting that "denying a citizen access to a fundamental right 'for failing to do that which they cannot do' is irrational and cannot survive any level of scrutiny." (Doc. No. 67, at 16, quoting *Zablocki v. Redhail*, 434 U.S. 374,  394 (1978) (Stewart, J., concurring in judgment).).[4]  Simply asserting the State's action is irrational does not make it so.  The State has asserted rational reasons for the legislation, and, as already discussed, the fact that the statute may discriminate on the basis of wealth is not, alone, a reason for striking it down.[5]

Further, the Court is cognizant of the fact that the statutory requirement that convicted felons be

---

[4] In *Zablocki*, the Supreme Court overturned a Wisconsin statute which provided that no person having minor children not in his or her custody and for whom he or she owed child support could marry without court approval.  A majority of the Court, lead by Justice Marshall, held that marriage was a right of "fundamental importance," that the statute at issue significantly interfered with that right, and therefore that the statute was subject to strict scrutiny.  434 U.S. at 383.  The Court further found that the statute at issue was not narrowly tailored to further a compelling state interest and therefore violated the Equal Protection Clause.  Justice Stewart filed an opinion concurring in judgment in which he observed that the "Equal Protection Clause deals not with substantive rights or freedoms but with invidiously discriminatory classifications," of which race was the paradigmatic example.  *Id.* at 391 (Stewart, J., concurring).  On that basis, Justice Stewart believed that the statute was problematic, not because it affected some people differently than others but because it was an unwarranted encroachment upon a constitutionally protected freedom and therefore violated the Due Process Clause of the Fourteenth Amendment.  Read in context, the statement quoted in the Plaintiffs' brief should be read to assert that, insofar as the government's objective was to obtain payment from persons wishing to marry and thereby to reduce the State's welfare load, it was irrational for the State to expect to further that interest by requiring payment from those who were indigent and could not pay.  Justice Stewart also recognized however, that the State's requirement was "substantially more rational if viewed as a means of assuring the financial viability of future marriages."  *Id.*  He just questioned whether the statute was narrowly tailored to further that objective.

[5] Plaintiffs have not addressed the question of whether they may be able to obtain a Court order modifying their child-support obligations or either reducing or eliminating their obligation to pay past-due amounts based on their financial status.  Nor have they addressed what effect doing so might have on their eligibility to register to vote.

current in all child-support payments before being eligible for reenfranchisement bears a particularly tenuous relationship with any legitimate state objective particularly when, as appears to be the case for plaintiffs Johnson and Harris, the parent owing past-due child support actually has custody of the child and cannot in any sense be charged with being a "dead-beat" parent. Plaintiffs argue that this restriction on voting-rights restoration is no more rational than a requirement that a convicted felon be current on mortgage payments or credit card bills before being permitted to register to vote. Plaintiffs may well be correct, but the fact remains that Tennessee has a legitimate interest in encouraging payment of child-support obligations, and § 40-29-202(c) is not unrelated to the promotion of that interest.

Essentially the only real argument Plaintiffs offer in their attempt to negate the validity of the State Officials' proffered rational basis for the legislation at issue is that "[t]here is no reason to believe that the non-payment of an often sizeable financial obligation immediately upon release from supervision can in any way be used as a proxy for determining a citizen's commitment to abide by the laws. If anything, the [legal financial obligation] requirement creates a serious barrier for purposes of rehabilitation and reintegration into society . . . ." (Doc. No. 67, at 16.) While Plaintiffs may well be correct, their argument is best addressed to the state legislature. *Cf. Richardson v. Ramirez*, 418 U.S. at 55 (acknowledging the respondents' argument "that it is essential to the process of rehabilitating the ex-felon that he be returned to his role in society as a fully participating citizen when he has completed the serving of his term," but also recognizing that it was not the Court's role "to choose one set of values over the other," and that policy arguments of this type were more appropriately "addressed to the legislative forum which may properly weigh and balance them against those advanced in support of California's present constitutional provisions") *Id.*

In sum, the Court finds that subsections (b) and (c) of Tenn. Code Ann. § 40-29-202, the provisions challenged by Plaintiffs, do not violate the Equal Protection Clause. The first and second counts of Plaintiffs' Amended Complaint are therefore subject to dismissal.

### B. Whether § 40-29-202 Violates the Twenty-Fourth Amendment

Section 1 of the Twenty-Fourth Amendment to the United States Constitution states:

> The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.

The Supreme Court has construed the Voting Rights Act as creating a private right of action to enforce the Twenty-Fourth Amendment's prohibition against imposition of a poll tax. *Morse v. Republican Party of Va.*, 517 U.S. 186, 231 (1996).

The Supreme Court first had occasion to construe this Amendment in the case of *Harman v. Forssenius*, 380 U.S. 528 (1965), where it noted the purposes and concerns that prompted its passage:

> One of the basic objections to the poll tax was that it exacted a price for the privilege of exercising the franchise. . . . Another objection to the poll tax raised in the congressional hearings was that the tax usually had to be paid long before the election—at a time when political campaigns were still quiescent—which tended to eliminate from the franchise a substantial number of voters who did not plan so far ahead. The poll tax was also attacked as a vehicle for fraud which could be manipulated by political machines by financing block payments of the tax. In addition, and of primary concern to many, the poll tax was viewed as a requirement adopted with an eye to the disenfranchisement of Negroes and applied in a discriminatory manner.

*Id.* at 539–40 (footnotes omitted). The Court applied the Amendment in that case to strike down a Virginia statute that required voters either to pay the same poll tax still required at that time in state elections or to file a certificate of residence six months prior to the election, largely on the basis that states "may not impose a penalty on those who exercise a right guaranteed by the Constitution." *Id.* at 540 (citations omitted). A year later, the Court struck down Virginia's poll tax altogether, even as it applied to state elections, on equal-protection grounds. *Harper v. Va. Bd. of Elections*, 383 U.S. 663 (1966).

Neither the Supreme Court nor any Circuit Court of Appeals has, based on this Court's research, ever applied the Twenty-Fourth Amendment in any context that did not involve an explicit and unambiguous poll tax.[6] The Second Circuit case on which the Plaintiffs rely, *Bynum v. Connecticut*

---

[6] *See, e.g.*, *Gonzalez v. Arizona*, 485 F.3d 1041, 1049 (9th Cir. 2007) (in a case involving a Twenty-Fourth Amendment challenge to a state statute requiring persons wishing to register to vote for the first time present proof of citizenship, the court rejected plaintiffs' argument that the statute required some citizens to spend money to obtain documents necessary to register to vote and therefore amounted to a tax on voting, on the grounds that voters did not have to choose between paying a poll tax and providing proof of citizenship when registering to vote, nor did the challenged provision "make[ ] the affluence of the voter or payment of any fee an electoral standard" (quoting *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 666 (1966)); *Johnson v. Bush*, 405 F.3d 1214, 1216 n.1 (11th Cir. 2005) (en banc) (rejecting a challenge to Florida's felon disenfranchisement law and observing, in a footnote, that although the plaintiffs also challenged the law as a violation of state and federal prohibitions against poll taxes, it did not actually reach the question of "whether conditioning an application for clemency on paying restitution would be an invalid poll tax"); *Howard v. Gilmore*, No. 99-2285, 2000 WL 203984, at *2,

*Commission on Forfeited Rights*, 410 F.2d 173 (2d Cir. 1969), is not to the contrary.  In that case, the plaintiff brought suit asserting that Connecticut, having agreed to permit ex-felons to regain vote and having established administrative machinery for that purpose, could not then deny access to the right to vote solely because an ex-felon is too poor to pay the required fee of five dollars.  The plaintiff sought injunctive and declaratory relief and also requested the district court convene a three-judge panel to review his claim, a three-judge panel being the only mechanism available at the time for enjoining enforcement of a state statute.  The district court denied the request for a three-judge panel and dismissed the claims.  The Second Circuit reversed, holding simply that the claimant raised a "substantial question which merits the consideration of a three-judge court."  *Id.* at 175.  Notably, *Bynum* predates *Richardson v. Ramirez*, such that even if the Second Circuit had reached any holding or directed the three-judge panel as to how it should rule on the plaintiff's claims, its decision would be of limited precedential value.

The few district courts of which this Court is aware that have considered the precise question raised here have concluded that statutes requiring convicted felons to pay all court-ordered restitution before having their voting rights restored do not violate the Twenty-Fourth Amendment.  For instance, in the case of *Johnson v. Bush*, 214 F. Supp. 2d 1333 (S.D. Fla. 2002), *aff'd on other grounds*, 405 F.3d 1214 (11th Cir. 2005) (*en banc*), the court distinguished between a condition imposed on the restoration of voting rights once those rights had been legally stripped, and a tax on a still-existing right to vote:

> An unconstitutional poll tax . . . directly burdens the exercise of an individual's proper exercise of their right to vote.  As previously stated in this order, the State has permissibly

---

(4th Cir. Feb. 23, 2000) (rejecting an ex-felon's claim that the requirement that he pay a ten dollar fee in order to begin the process of having his civil rights restored—and consequently his right to vote—violated the Twenty-Fourth Amendment, stating, "it is not [plaintiff's] right to vote upon which payment of a fee is being conditioned; rather, it is the restoration of his civil rights upon which the payment of a fee is being conditioned.  Consequently, [plaintiff] states no claim under the Twenty-fourth Amendment."); *Beare v. Briscoe*, 498 F.2d 244, 245 n.1 (5th Cir. 1974) (affirming the district court's holding that a Texas voter registration requirement violated the Equal Protection Clause but observing, in a footnote, that it was "unnecessary to consider the [plaintiffs'] alternative argument that on the facts of this case, annual voter registration is a substantive equivalent of a poll tax and thus conflicts with the due process clause of the Fourteenth Amendment and the Twenty-Fourth Amendment").

stripped Plaintiffs of their right to vote along with other civil rights pursuant to their felony convictions. The State is not constitutionally obligated to return this right to them on completion of their sentence. The victim restitution requirement, then, does not unduly burden the exercise of their right to vote given that that right has already been stripped from them. The victim restitution requirement is not a special fee that they must pay in order to exercise a right already existing in them, but a requirement made within the authority of the State to begin the process of having their civil rights fully restored.

*Id.* at 1343 (footnotes and citation omitted).

In another very recent opinion, the District of Arizona considered a Twenty-Fourth Amendment challenge to a state statute requiring ex-felons to pay all court-ordered victim restitution before they could regain the right to vote. *Coronado v. Napolitano*, No. CV-07-1089-PHX-SMM, 2008 WL 191987, at *4–*5 (D. Ariz. Jan. 22, 2008). In reaching its decision, the court first observed that felons in Arizona have no right to vote—fundamental or otherwise—that could be abridged by the statutes they challenged since that right had been lawfully stripped once they were convicted of a felony. Thus, the restoration of civil rights once they have been lawfully stripped is a "creature of statute," *id.* at *5 (quoting *State v. Buonafede*, 814 P.2d 1381, 1383 (Ariz. 1991)). The court continued:

> The question remains whether Plaintiffs state a claim on the grounds that the fines and restitution requirement denies them the right to vote "for reason of failure to pay a poll tax or any other tax." U.S. Const. amend. XXIV. That inquiry turns on whether the fines and restitution requirement constitutes a "tax," as Plaintiffs allege that their civil rights would otherwise be automatically restored under A.R.S. § 13-912.
>
> "Poll tax" is defined as "a fixed tax levied on each person within a jurisdiction.["] Black's Law Dictionary 1498 (8th ed.2004). "Poll taxes are laid upon persons . . . to raise money for the support of government or some more specific end." *Breedlove v. Suttles*, 302 U.S. 277, 281 (1937), *overruled on other grounds by Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966). Although a state may not make "the affluence of the voter or payment of any fee an electoral standard," states do have "the power to fix qualifications." *Harper*, 383 U.S. at 666, 668. States may permissibly fix as a qualification for voting the requirement that a persons [sic] not have been convicted of a felony. It follows that, having decided to re-enfranchise exfelons, Arizona may permissibly fix as a qualification the requirement that those individuals complete the terms of their sentences. The Arizona laws do not make ability to pay "an electoral standard," but limit re-enfranchisement to those who have completed their sentences—including the payment of any fine or restitution imposed.

*Coronado*, 2008 WL 191987, at *5 (footnote and some citations omitted). On that basis, the court rejected the plaintiffs' Twenty-Fourth Amendment challenge.

This Court finds the reasoning employed by the District of Arizona and the Southern District of Florida to be persuasive. Plaintiffs here, having been convicted of committing a felony, no longer have a fundamental right to vote, so the statutory limitations on the restoration of that right do not impinge a right

already granted, but instead define the conditions upon which restoration of that right will be premised. It is not unreasonable or impermissible for a state to require a convicted felon to complete his entire sentence, including the payment of restitution,[7] prior to having his voting rights restored. Further, although payment of child support is not part of the Plaintiffs' sentences, the obligation is a legal one that arises from a court order. Imposing a requirement that convicted felons comply with such outstanding court orders cannot reasonably be construed as a "tax" on voting. The policy decisions that led to the passage of the challenged statutory provisions do not raise any of the concerns that resulted in the prohibition of poll taxes in the first place.

Because Plaintiffs come to the bar already stripped of their fundamental right to vote and because the requirements imposed by statute cannot be deemed taxes, the Twenty-Fourth Amendment's prohibition on poll taxes simply is not implicated.

In sum, the Court finds that the statutory provisions at issue do not violate the Twenty-Fourth Amendment, and Count Three of Plaintiffs' Amended Complaint must therefore be dismissed.

C.      Whether § 40-29-202 Violates the Ex Post-Facto Clause of the U.S. or Tennessee Constitutions

Tennessee's felon re-enfranchisement law was amended in 2006, at which time subsections (b) and (c) of Tenn. Code Ann. § 40-29-202 were enacted. Prior to 2006, Tennessee law did not require a convicted felon to pay all restitution or to be current on child-support payments before having his or her voting rights restored. Thus, under the prior re-enfranchisement provisions, Plaintiffs, who were all convicted prior to 2006, would have been eligible to have their voting rights restored. Plaintiffs insist that the 2006 amendments, by interfering with their ability to apply for a voter's registration card, retroactively increase the penalties and punishment to which they are subject for their crimes and that they therefore violate the Ex Post Facto Clauses contained in the Tennessee and United States Constitutions.

Article 1, Section 11 of the Tennessee Constitution states that "laws made for the punishment of acts committed previous to the existence of such laws, and by them only declared criminal, are contrary to the principles of a free Government; wherefore no Ex post facto law shall be made." Similarly, the United States Constitution provides that "[n]o State shall . . . pass any . . . ex post facto Law." U.S.

---

[7] Plaintiff's argument that in Tennessee, payment of restitution is not part of a felon's "sentence" is simply incorrect.

Const., Art. 1, § 10.  Although the Tennessee Supreme Court has construed the state provision to have a broader reach than its federal counterpart, *Utley v. Tenn. Dep't of Corrections*, 118 S.W.3d 705, 715 (Tenn. Ct. App. 2003), when a party raises a challenge under both state and federal Ex Post Facto Clauses, the Tennessee appellate courts conduct a single analysis for both claims, and they follow United States Supreme Court precedent when interpreting both the federal and state clauses.  *Doe v. Bredesen*, 507 F.3d 998, 1008 (6th Cir. 2007) (citing *King v. Tenn. Bd. of Paroles*, No. M2005-2821-COA-R3-CV, 2007 WL 1555815 (Tenn. Ct. App. May 29, 2007); *Powers v. Tenn. Bd. of Probation & Paroles*, No. M2005-1529-COA-R3-CV, 2007 WL 1515141, at *7 (Tenn. Ct. App. May 23, 2007); *In re Rahim*, No. M2006-2216-COA-R3-CV, 2007 WL 1308322, at *2 (Tenn. Ct. App. May 3, 2007)).

The Ex Post Facto Clause of the United States Constitution prohibits laws that punish retrospectively.  " '[A] law is retrospective if it changes the legal consequences of acts committed before its effective date.' "  *United States v. Davis*, 397 F.3d 340, 347 (6th Cir. 2005) (quoting *Miller v. Florida*, 482 U.S. 423, 430 (1987)). " '[T]he focus of the ex post facto inquiry,' " however, " 'is not whether a legislative change produces some ambiguous sort of 'disadvantage' . . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which the crime is punishable.' "  *Dyer v. Bowlen*, 465 F.3d 280, 289 (6th Cir. 2006) (quoting *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 506 n.3 (1995)).

When evaluating an ex post facto claim, the Court's first task is to "ascertain whether the legislature meant to establish 'civil' proceedings."  *Smith v. Doe*, 538 U.S. 84, 92 (2003) (quoting *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997).)  If the intent of the legislature was to impose punishment, that ends the inquiry.  If, however, " 'the intention was to enact a regulatory scheme that is civil and nonpunitive, we further examine whether the statutory scheme is so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.' "  *Hendricks*, 521 U.S. at 361 (quoting *United States v. Ward*, 448 U.S. 242, 248–49 (1980)).  Because courts "ordinarily defer to the legislature's stated intent, . . . only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty[.]"  *Smith*, 538 U.S. at 92 (internal citations and quotations omitted).

"Whether a statutory scheme is civil or criminal 'is first of all a question of statutory construction.' "

*Smith*, 538 U.S. at 92 (quoting *Hendricks*, 521 U.S. at 361) (other citation omitted).  This Court must consider the statute's text and its structure to determine the legislative objective.  *Smith*, 538 U.S. at 92–93 (citing *Flemming v. Nestor*, 363 U.S. 603, 617 (1960)).  The first question then is whether the Tennessee legislature, in amending the felon franchise restoration provisions, "indicated either expressly or [implicitly] a preference for one label or the other," *i.e.*, civil or criminal.  *Smith*, 538 U.S. at 93 (quoting *Hudson v. United States*, 522 U.S. 93, 99 (1997)).

Plaintiffs here insist that the provisions they challenge are criminal and punitive in nature, citing the recent case of *May v. Carlton*, 245 S.W.3d 340, 349 (Tenn. 2008), in which the Tennessee Supreme Court held that "laws disenfranchising felons are penal in nature."  *See also Gaskin v. Collins*, 661 S.W.2d 865, 868 (Tenn. 1983) (holding that the Ex Post Facto Clause of the Tennessee Constitution "prohibits the General Assembly from retroactively disenfranchising convicted felons who have never been adjudged infamous").  Plaintiffs also point out that the provision at issue falls within the "Criminal Procedure" section of the Tennessee Code, which Plaintiffs insist "further establishes that Tennessee's disenfranchisement law is an additional criminal penalty for conviction."  (Doc. No. 67, at 22.)

In reality, although the challenged statute falls within Title 40 of the Tennessee Code, "Criminal Procedure," it also falls within the Chapter entitled "Restoration of Citizenship," the purpose of which is clearly not punitive in nature.   Moreover, although laws disenfranchising felons are punitive in nature, laws providing for the *re-enfranchisement* of felons are not.  The Court concludes that the statutory provisions at issue were not intended to be punitive or criminal in nature.  Rather, they are civil, non-punitive measures for regulating applications to have the right to vote restored.

Notwithstanding that conclusion, the Court must still " 'analyze the practical effect of the challenged provisions," considering such factors as whether the State's re-enfranchisement scheme "has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with regard to this purpose.' "  *Doe v. Bredesen*, 507 F.3d 998, 1004 (6th Cir. 2007) (quoting *Smith*, 538 U.S. at 97) (other citations omitted).  These factors, although most relevant, "are not necessarily exhaustive or dispositive."  *Doe*, 507 F.3d at 1005 (citing *Smith*, 538 U.S. at 97).

There is no evidence that the State's re-enfranchisement scheme has traditionally been regarded

as punitive, and it does not promote the traditional aims of punishment. Further, while the law disenfranchising felons as an initial matter may certainly be construed to impose an affirmative disability, it is not reasonable to construe the laws regulating the restoration of voting rights as doing so. Finally, as discussed above in connection with Plaintiff's Equal Protection Clause claim, the State's scheme has a rational connection to a non-punitive purpose and is not excessive in that regard. Plaintiffs have not pointed to any other factors that should be considered relevant, and the Court concludes that the State's re-enfranchisement scheme is not punitive in nature. On that basis alone, Plaintiffs' Ex Post Facto Clause claims must fail.

Even if § 40-29-202(b) and (c) are considered to be punitive in nature, however, Plaintiffs' claim still fails because the provisions neither alter the definition of the crimes for which the Plaintiffs were convicted nor increase the punishment associated therewith. More specifically, the challenged provisions do not change the fact that Plaintiffs' right to vote was stripped at the time they first were convicted of an "infamous crime," which is the critical distinction between the case at bar, on the one hand, and *May* and *Gaskin* on the other. In those cases, upon which Plaintiffs here rely, the definition of a crime, that is, whether it was considered a felony or a misdemeanor, changed after the plaintiffs' convictions. In the case at bar, however, the definition of Plaintiffs' crimes has not changed, nor has the punishment: disenfranchisement. The statutes pertaining to felon re-enfranchisement do not "increase" that punishment merely by redefining what is required in order to have one's voting rights restored, even if that redefinition makes it more difficult for some felons to be eligible to apply to vote. As the State Officials point out, before the passage of the challenged statutory provisions, Plaintiffs were ineligible to vote. After their passage, Plaintiffs remained ineligible to vote. The only thing that has changed are the conditions governing their ability to regain the right of suffrage.

Plaintiffs' claims under the Ex Post Facto Clauses of the Tennessee and United States Constitutions will therefore be dismissed.

D. **Whether § 40-29-202 Violates the Privileges and Immunities Clause of the U.S. and Tennessee Constitutions**

Plaintiffs do not cite, nor has the Court discovered, any case stating that the right to vote in federal elections is a privilege or immunity of the citizens of the United States. Even assuming for purposes of this motion that the right to vote is a privilege or immunity of the citizens of the United States,

Plaintiffs' claim under the Privileges or Immunities Clause of the Fourteenth Amendment fails for the same reasons as their claims under the Equal Protection Clause (Counts One and Two). The "privilege" or right of ex-felons to vote in federal elections can be suspended without violating the Constitution. *Richardson v. Ramirez*, 418 U.S. at 56. Plaintiffs therefore cannot legitimately claim that the privilege has been "abridged" in violation of the Privileges or Immunities Clause of the Fourteenth Amendment. Quite simply, a practice that is authorized under § 2 of the Fourteenth Amendment cannot be deemed prohibited under § 1. Moreover, to the extent Tennessee's re-enfranchisement scheme does abridge Plaintiffs' right or privilege to vote, it is rationally related to a legitimate governmental interest as discussed above in connection with Plaintiffs' Equal Protection Clause challenge.

## IV.  PLAINTIFFS' MOTION FOR JUDGMENT

For all the reasons discussed above, the Court finds that the State Officials are entitled to judgment in their favor, and Counts One through Five of the Plaintiffs' amended complaint will be dismissed. Plaintiffs' motion for judgment on the pleadings is premised upon the same arguments raised in their opposition to the State Officials' motion, none of which is availing. The Plaintiffs' motion must therefore be denied.

## V.  CONCLUSION

For the reasons stated above, the State Officials' motion for judgment on the pleadings will be granted and the Plaintiffs' motion denied. Because plaintiff Alexander Friedmann's due process claim under Count VI of the Amended Complaint remains in play, the matter will be remanded back to Magistrate Judge Griffin for further case management as necessary.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge